In the Matter of the Condemnation by the **MINNEAPOLIS COMMUNITY DE-VELOPMENT AGENCY** of Certain Lands in the City of Minneapolis.

No. CO–89–513.

Supreme Court of Minnesota.

May 11, 1989.

Robert Hajek, Warchol, Berndt & Hajek, P.A., Minneapolis, for appellant.

Popham, Haik Schnobrich & Kaufman, Wayne Popham, Minneapolis, for respondent.

Heard, considered, and decided by the court en banc.

SIMONETT, Justice.

This is an appeal from orders of the district court granting a petition to condemn property and authorizing a quick take. The appellant landowner claims the taking violates the establishment clause of the First Amendment and asks either that the condemnation proceeding be dismissed or that an evidentiary hearing be held on the constitutionality of the taking. We deny appellant's claims and affirm the district court.

The LaSalle Place Development Project is a program to develop a block in downtown Minneapolis bounded by Hennepin Avenue, Eighth Street, LaSalle Avenue, and Ninth Street. This block is within a development district authorized by the City of Minneapolis and created by the Minneapolis Community Development Agency (the Development Agency). It is also within a new tax increment district. The Development Agency has entered into a contract with HTPG Associates Limited Partnership (the Developer) to develop the project. Plans include restoring and preserving the State Theater Building, rehabilitating the existing YMCA Tower for rental housing or office space, and demolishing other existing buildings in the block to be replaced by new construction. To acquire the property to carry out this project, the Development Agency has filed a petition for condemnation. The petition includes a parcel fronting on Hennepin Avenue owned by appellant, Demos Realty.

In the southeastern corner of the block is the YMCA Tower building owned by the Young Men's Christian Association of Metropolitan Minneapolis (the YMCA). This property, although part of the development project, is not included in the condemnation petition. Instead, the Development Agency has agreed with the Developer to purchase the YMCA Tower from the YMCA for not more than $2.5 million and to convey it to the Developer for one dollar. In turn, the YMCA has contracted with the Developer to buy, for $630,000, condominium space in a new building to be erected by the Developer mostly on the site where the Demos building is now located. As owner of the condominium space, the YMCA will build, at its own expense, a new facility for its operations.[1]

The petition for condemnation was filed in district court on December 12, 1988. With the petition, the Development Agency also filed a motion for a "quick take" pursuant to Minn.Stat. § 117.042 (1988). Demos Realty filed a motion to dismiss the petition because the taking was unconstitu-

---

1. The new YMCA facility will consist of approximately 115,000 gross square feet of space in the six above-ground levels of the new building and on the roof, plus apparently some incidental use of the first underground level of the building.

The facilities will include, among other things, a day care center, gymnasium, multi-purpose room, swimming pool, lockers, playing courts, exercise room, track, lounge, assembly room, and regional administrative offices.

tional or, in the alternative, for an evidentiary hearing or trial. Demos contended that the YMCA is a religious organization and that the proposed taking is an integral step in a development project which will aid and advance the religious purposes of the YMCA. Considerable documentary evidence was produced at the hearing, including the various contracts involving the city, the Development Agency, the Developer, and the YMCA. Also produced were documents describing the YMCA, its organization, operations, and aims.

The district court conducted a hearing on January 27, 1989. Demos' motion for a further evidentiary hearing was denied, and the petition for condemnation was granted, including the quick take. Demos' subsequent request for a stay of enforcement of the quick take order was also denied. Demos has appealed from the orders of the district court. We granted the Development Agency's request for accelerated review. An amicus brief has been filed by the Minnesota Civil Liberties Union. Additional facts will be developed in the discussion which follows.

### I.

We have two threshold issues: (1) Is appellant's First Amendment challenge properly before the court at this time? (2) If so, should appellant's request for an evidentiary hearing on its constitutional challenge have been granted?

The Development Agency contends that at the hearing on the petition to condemn the only issue is whether the petition meets the requirements for eminent domain, *i.e.,* whether the procedural requirements have been met and whether the taking is necessary and for a public purpose. *See* Minn. Stat. § 117.075 (1988). This is not the time nor place, says the Development Agency, for appellant to raise an issue involving the constitutional implications of the development project itself.

▆ Here the district court has found the taking is necessary and for a public purpose; indeed, Demos does not challenge this finding except as the taking may impermissibly benefit the YMCA. In *State*

*by Spannaus v. Hopf,* 323 N.W.2d 746 (Minn.1982), the state petitioned to condemn defendant's outdoor advertising signs. On appeal from a granting of the petition, we considered the defendant's constitutional claims that the taking violated the equal protection clause and defendant's free speech rights under the First Amendment. *Id.* at 752–53. Similarly, we see no reason why we should not consider Demos' constitutional claims at this time in this appeal.

Demos next argues it was denied the right to an evidentiary hearing under Minn. Stat. § 117.075, which says "the court * * * shall hear all competent evidence offered for or against the granting of the petition, regulating the order of proof as it may deem best." Demos cites several of our cases where evidentiary hearings were held prior to the granting of the condemnation petition. *See, e.g., City of Duluth v. State,* 390 N.W.2d 757, 762 (Minn.1986); *City of Minneapolis v. Wurtele,* 291 N.W. 2d 386, 389 (Minn.1980); *State v. Anderson,* 220 Minn. 139, 146, 19 N.W.2d 70, 74 (Minn.1945).

▆ We agree the objecting landowner is entitled to an evidentiary hearing. No record was made of the January hearing. It appears, however, that considerable documentary evidence was presented to the court on the constitutional issue and that the issues were thoroughly argued and briefed. The trial court then made findings and arrived at its decision that there was no constitutional violation involved in the taking. The question, then, is whether the January evidentiary hearing provided by the trial court was adequate.

Demos contends that a further hearing was necessary so it could present more testimony on the YMCA's religious status and future intentions, as well as expert testimony on the financing arrangements, the nature of the benefits to be received by the YMCA, and the reasonableness of the price paid to the YMCA for its building. It seems to us, however, as will become evident in Part II of this opinion, that the January 27, 1989, hearing on the petition

constituted an adequate evidentiary hearing on the constitutional issues. The facts Demos claims it would produce at a further evidentiary hearing are already before the court in sufficient detail. The nature of the benefits to the YMCA and the financing arrangements are determined by the contracts in the present record. Evidence of the religious aspects of the YMCA are set out in the submitted documents, and, indeed, the religious nature of the YMCA is not disputed by the Development Agency. Demos has failed to show how any information it might produce at a further evidentiary hearing is needed to resolve its constitutional claims. Apparently, too, this was the view of the trial court. It appears that Demos did not claim dissatisfaction with the record until after it received an adverse decision. We hold it was not error for the trial court to deny Demos' motion for a further evidentiary hearing.[2]

## II.

We now take up the constitutional issue. The First Amendment prohibits state action "respecting an establishment of religion." The establishment clause is intended to prevent "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). An establishment clause challenge invokes the three-part *Lemon* analysis: (1) the state's program must have a secular legislative purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Here it is undisputed that the development project has a sec-

ular purpose. Demos claims, however, that the "advancement" and "entanglement" prohibitions have been violated.

Admittedly, the YMCA has a religious dimension. Apparently it was originally incorporated as a religious association, *see* Minn.Stat. § 315.44 (1988), although it has since chosen to be governed as a nonprofit corporation. *See* Minn.Stat. § 317.06(2) (1988). The YMCA claims a real estate tax exemption as "an institution of purely public charity" and, in its tax exemption statement, states the principal use of its property to be:

> To carry out the program services necessary to achieve the charitable and social purposes for which this association was organized and for which it is incorporated in the State of Minnesota, particularly those related to social and physical development, training, camping, environmental education, recreation and counseling for youth and other persons.

Demos points out that the Minneapolis YMCA is affiliated with the National YMCA Council which states its purpose to be: "The Young Men's Christian Association we regard being in its essential genius a worldwide fellowship united by a common loyalty to Jesus Christ for the purpose of developing Christian personality and building a Christian society." Demos also quotes from the constitution of the National Council the statement that the Young Men's Christian Association, in its role of improving the spiritual, intellectual, and physical well-being of young people, seeks "to develop a faith for daily living based upon the teaching of Jesus * * *."

The informational brochure of the Minneapolis YMCA gives a general description of its operations, including membership eligibility and the programs and services avail-

---

**2.** The Development Agency, as already mentioned, also filed a petition for transfer of title and possession under Minn.Stat. § 117.042 (1988). This quick take statute permits the petitioner to acquire title and possession of an owner's property prior to the filing of an award by giving 90 days' notice and depositing the appraised value of the property with the court.

Demos claims this quick take procedure denies it due process because, if it should subse-

quently be determined that its property (perhaps by then demolished) should not have been taken, it will then be too late and it will be without an adequate remedy. In *Fine v. City of Minneapolis*, 391 N.W.2d 853, 856 (Minn.1986), we pointed out that the landowner is not without a remedy, that it may recover compensation for destruction of its property, and that the quick take statute is constitutional.

able. The brochure has a Mission Statement stating, "The Downtown YMCA is a human care organization committed to the enhancement of Christian values."[3] The brochure mentions among its many programs the New Media Bible, a series of films depicting biblical scenes "available for use by local groups."[4]

It is undisputed, however, that the YMCA also provides nonsectarian recreational, health, and social service activities without regard for any religious belief or affiliation. The Development Agency points out that the YMCA operates predominantly as a health and recreation facility, available, as its brochure states, to "all persons, all religions, races, ages, and needs." The public considers the Minneapolis YMCA as serving a useful nonsectarian charitable purpose as evidenced by the inclusion of the organization in the United Way Fund. It is this secular, communitywide operation, says the Agency, which makes the YMCA a desirable anchor tenant for the LaSalle Place Project, attracting the general public and invigorating the economic and social environment of the project to the benefit of the entire downtown community.

*The "advancement" test*

■ For purposes of constitutional analysis, the question is not whether the YMCA has religious aspects, which admittedly it does, but the extent to which the religious dimension permeates the institution. In determining whether state aid advances religion in violation of the establishment clause, the test is:

Aid normally may be thought to have a primary effect of advancing religion

when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

*Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973).

■ Here the trial court found that the Minneapolis YMCA is not pervasively religious, that its functions are not subsumed in its religious mission. This finding is amply sustained by the evidence and is not clearly erroneous. If one looks beyond the "institutional rhetoric," *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874, it appears that despite its name and religious roots, the YMCA operates its health and recreational center in a nonsectarian manner. Moreover, it is clear, as the trial court also found, that the LaSalle Place Project does not fund a specifically religious activity in an otherwise substantially secular setting.

■ Because any aid would not have a primary effect of advancing religion, we need not consider whether, in fact, aid is being received. Nevertheless, it is clear to us that any aid the YMCA receives is no more than the reduced interest charges the Baptist college in *Hunt* was able to obtain by financing its construction with revenue bonds issued by a state-created authority. Demos suggests there may be a question of the reasonableness of the price paid for the YMCA parcel and of the YMCA investment, as well as the use of tax increment financing. The trial court, however, based on its review of the contract documents,

---

**3.** The Mission Statement goes on to say that its mission is—
  * To significantly influence the quality of life for all persons, all religions, races, ages, and needs.
  * To promote total human health: body, mind and spirit.
  * To focus on physical well-being, spiritual discovery, ethical and social values and interpersonal relations.
  * To serve as a common meeting ground of the Downtown community.
  * To maintain an organization of employees and volunteers who are at all times respected, accessible, involved and committed.

**4.** The New Media Bible is described as follows: The YMCA has available for use by local groups a series of twenty 15–20 minute, 16mm color films which depict scenes from the Bible. The series, entitled "The New Media Bible," has 18 films on Genesis (Chapters 1–50) and 15 from Luke's gospel (Chapters 1–24). A session for group leaders is required for use. After completion of the training, one may borrow the films from the YMCA free of charge. Persons interested in the training session should call 371–8798.

found that "no aid was given to the YMCA," and this finding is not clearly erroneous. Despite the tax increment financing arrangement, the YMCA is contracting independently with the Developer for the building of its own facilities and will pay, with its own funds, for the development of its condominium space. The YMCA and the Developer will share the "hard costs" of constructing the common support elements of the new building; in addition, although Demos argues that the YMCA pays no "developer's fee," the YMCA does pay its share of the "soft costs" for design and architectural services. In other words, the YMCA is not receiving any public subsidy but is paying its own way.[5] Of course, there are advantages to the YMCA in having new quarters in a rejuvenated downtown block, just as there are advantages to the project in having a health and recreational center as an anchor. But these indirect considerations do not impose upon the neutrality required by the establishment clause. *See also Minnesota Higher Educ. Facilities Auth. v. Hawk,* 305 Minn. 97, 232 N.W.2d 106 (1975) (where this court, following *Lemon* and *Hunt,* upheld the constitutionality of revenue bonds issued by a state authority to finance facilities at state private colleges).

Finally, Demos points to a provision in the Developer's contract with the YMCA wherein the Developer agrees "not to build or lease space for others in the project for health or exercise club facilities that might compete directly for users with the YMCA * * *." This noncompetition clause, argues Demos, advances the purposes of the YMCA.

We fail to follow appellant's argument. Of course, the noncompetition clause advances the purposes of the YMCA, *i.e.,* its nonsectarian business purposes. Any tenant making a substantial business investment would want protection against debilitating competition from another tenant in the same block. A developer, too, prefers one thriving tenant to two struggling competitors. We take judicial notice that noncompetition agreements in commercial complexes are common. In other words, the purpose of the noncompetition clause is to advance business, not religion. If anything, the presence of the noncompetition clause supports the Agency's argument that the YMCA's presence in the block is a nonsectarian, business purpose.

We conclude, as did the trial court, that the taking challenged here neither advances nor inhibits religion.

*The "entanglement" test.*

■ Excessive entanglement arises when the state's involvement with a religious institution creates a need for "comprehensive, discriminating, and continuous state surveillance"; it applies only in those cases where the government must be sure that its aid is used only for secular purposes. *See Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114; *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

■ Demos points to documents wherein the Developer and the YMCA agree to cooperate in the development of the La-Salle Place Project. This is an understanding the YMCA has with the Developer, not the Development Agency. In any event, in planning and building the project, one would expect the YMCA in constructing its new quarters as the anchor tenant to coordinate its efforts with the Developer. This does not create any entanglement with religion. To the extent it can be said the Development Agency is involved, its involvement is indirect and is analogous to the one-time construction grant in *Tilton* which was held not to be an entanglement. 403 U.S. at 688, 91 S.Ct. at 2100. We do not have here any ongoing grants nor any need for ongoing governmental supervision of the YMCA's activities. This, too, was the conclusion of the trial court.

---

**5.** "[T]he proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected. Stated another way, the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends." *Hunt,* 413 U.S. at 742–43, 93 S.Ct. at 2873–74 (citations omitted).

Demos also contends there should be restrictions on the sectarian use of the YMCA property. Its argument stems from a misreading of *Tilton*. In that case federal legislation provided grants to colleges for construction of academic facilities which, however, could not be used for religious purposes for 20 years. This meant, said the United States Supreme Court, that the federal act expressly allowed the college to use the facility for any purpose at the end of 20 years, and this would include a religious use. The Court held this statutory provision facially invalid as violating the establishment clause. 403 U.S. at 683, 91 S.Ct. at 2098. Obviously, a statute affirmatively permitting religious use of a federally funded building is unconstitutional. There is no similar provision in any of the contracts for the LaSalle Place Project, either with the YMCA or, for that matter, with any tenant.

Neither do we see in this case need for restrictions forbidding a religious use not contemplated and which would be inconsistent with the contractual intent of the private parties. *See Roemer*, 426 U.S. at 760, 96 S.Ct. at 2351 (courts will presume parties will observe constitutional prohibitions). Here we have a private developer contracting with an organization not pervasively religious to provide, as an anchor tenant in a commercial redevelopment project, a nonsectarian, nonsubsidized health, day care, and recreational facility for the general public. To the extent the Development Agency has assisted to make the YMCA property available to the project, this is, as already observed, a one-time assistance only, which does not present any entanglement requiring use restrictions.

The Development Agency's condemnation proceeding neither advances religion nor fosters excessive government entanglement with religion and, therefore, does not violate the establishment clause.

Affirmed.